**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| THOMAS ANDREW CENSKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-02761-TWP-MJD |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO MEDICAL NEGLIGENCE

This matter is before the Court on the Defendant United States of America's ("the United States") Motion for Partial Summary Judgment as to Plaintiff Thomas Andrew Censke's ("Mr. Censke") medical negligence claim (Dkt. 100). Censke is a former federal prisoner. He initiated this lawsuit against the United States under the Federal Tort Claims Act, alleging that a group of correctional officers assaulted him in his cell and that the prison medical staff failed to adequately treat his injuries. Mr. Censke has failed to designate an expert witness, and there is no evidence in the record that the treatment he received following the alleged assault fell below the standard of care. Accordingly, the Defendant's Motion for Partial Summary Judgment as to medical negligence is **granted**.

### I. LEGAL STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Federal Rule of Civil Procedure 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the

nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Community Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

Pursuant to S.D. Local Rule 56-1(f), the facts claimed by the moving party are accepted as true so long as those facts are supported by admissible evidence and are not objected to by the opposing party. The Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009). Where Mr. Censke's objections to the United States factual claims are supported by admissible evidence, those objections will be taken as true for purposes of this Order.

## II. BACKGROUND

### A. Physical Altercation in Mr. Censke's Cell

On December 16, 2013, Mr. Censke and his cellmate were involved in a physical altercation with correctional officers in their cell at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"). (Dkt. 100-1, at 67-97.) According to Mr. Censke, two officers entered their cell during evening count, became aggressive, and maced them. *Id.* at 77-82. Shortly thereafter, a number of correctional officers returned to their cell, placed them in handcuffs, and physically assaulted them. *Id.* 90-97. The assault included numerous blows to Mr.

Censke's face and head. *Id.* Afterwards, correctional officers took Mr. Censke to the showers for decontamination. *Id.* at 98.

### B.     Medical Treatment Following the Altercation

After showering, Mr. Censke was examined by Nurse Joseph May, RN. ("Nurse May") (Dkt. 100-7.) Nurse May observed redness on the back of Mr. Censke's neck and redness on the middle of his back. *Id.* He did not observe redness, abrasions, bruising, or swelling elsewhere on Mr. Censke's body. *Id.* Mr. Censke was then taken to the Special Housing Unit ("SHU") where he was repeatedly checked on while in restraints throughout the night. (Dkts. 100-8, 100-9.)

The next morning, medical staff again checked the restraints. (Dkt. 100-10.) They noted that Mr. Censke did not have any wounds on his wrists and that he was able to use the urinal. *Id.* When Nurse May checked on Mr. Censke later that evening, he noticed abrasions on Mr. Censke's wrists, and he instructed Mr. Censke to keep the handcuffs away from the abrasions so they did not become worse. (Dkt. 100-11.) Nurse May checked on Mr. Censke again a few hours later and observed that the restraints were too high on Mr. Censke's wrists, which was aggravating the abrasions. (Dkt. 100-12.) Nurse May cleansed the abrasions and again instructed Mr. Censke to keep the restraints away from them. *Id.* At another check two hours later, Nurse May observed swelling in Mr. Censke's wrists, so the restraints were adjusted, and Nurse May placed Tefla pads over the abrasions. (Dkt. 100-13.)

Just after midnight, Nurse Karl Norris, RN, performed another restraint check and observed slight swelling in both of Mr. Censke's hands. (Dkts. 100-14, 100-15.) Approximately 10:00 a.m. the next morning, Nurse Matthew Worthington, RN, observed swelling in Mr. Censke's wrists and had the restraints loosened. (Dkt. 100-16.) Nurse Worthington examined Mr. Censke and found that his vital signs were normal, and his breathing was good. *Id.*

The restraints were removed from Mr. Censke on or around December 18, 2013, but he remained in the SHU until he was transferred several months later. (Dkt. 75 at 5.) Mr. Censke testified at his deposition that he experienced pain in his wrists throughout the time he was in restraints. (*See generally* Dkt. 100-1 at 108-111.)

On December 23, 2013, Mr. Censke was examined by Nurse Sara Booth ("Nurse Booth"). (Dkt. 100-17.) Nurse Booth observed a faded bruise to Mr. Censke's right temple, but there were no wounds or bruising elsewhere on his body. *Id.* Mr. Censke told Nurse Booth that he had neck pain, which was a pre-existing condition that he had been living with for several years, that was aggravated by the incident in his cell. *Id.* Mr. Censke also told Nurse Booth that he had pain in his ribs; Nurse Booth documented this pain and observed that Mr. Censke did not have difficulty breathing. *Id.*

C.   **Additional Medical Treatment at FCC Terre Haute**

Mr. Censke was seen by the medical staff twice on January 6, 2014. (Dkt. 100-18.) First, Nurse Booth examined him for a headache and left ear tenderness, which Mr. Censke attributed to the altercation in December. *Id.* at 5. Later that morning, Nurse Dana Dobbins, LPN, treated Mr. Censke for additional complaints of pain. *Id.* at 1.

On March 13, 2014, Mr. Censke was treated by Nurse Roger Cox for complaints of headaches, flashes of light, and dizziness. (Dkt. 100-19.) Mr. Censke did not have a headache during this visit and had stable vital signs. *Id.* He was referred for a vision consult to evaluate eye strain and migraines. *Id.* at 4.

In May 2014, Mr. Censke was seen several times for complaints of poor hearing in his left ear. On May 7, 2014, Nurse Booth observed a "scant amount" of dried blood and excoriations (self-inflicted ear picking) in his ear canal. (Dkt. 100-20.) The following week, Nurse Booth again

examined Mr. Censke, who showed medical staff bloody Q-tips from his ear. (Dkt. 100-21.) Nurse Booth told Mr. Censke to avoid inserting Q-Tips or other objects into his ears. *Id.* Two days later, medical staff flushed Mr. Censke's left ear, which resulted in a small amount of white-yellow drainage. (Dkt. 100-22.)

On March 19, 2015, Mr. Censke was examined for complaints of discomfort and tingling in his hands and fingertips. (Dkt. 100-23.) Nurse Herrell, NP, administered a Phalen's test, which was positive, indicating the possibility of carpal tunnel syndrome. *Id*. The Bureau of Prisons subsequently arranged for electrodiagnostic testing, which indicated mild left sensory-only median neuropathy, with possible left ulnar neuropathy. (Dkt. 100-24.)

**D.    Additional Medical Treatment at Other Federal Facilities**

On December 4, 2015, while housed at USP McCreary, Mr. Censke reported that other inmates had hit the back of his head, causing his head to hit concrete and resulting in a loss of consciousness. (Dkt. 100-25.) He was transported to the emergency room of an outside hospital. (Dkt. 100-26.) Mr. Censke told the medical staff in the emergency room that he had pain in the back of his head, pain in his neck, and "abdominal pain as an aching sensation" due to being "hit several times in the abdomen by fellow prisoners." *Id.* at 10. Due to these complaints, Mr. Censke underwent CT imaging of his head, spine, and abdomen. *Id.* at 3, 5, 7, 17. The CT scan showed that his cervical spine was normal and that he had only hematoma and contusion to his scalp "with no intracranial abnormality." *Id.* The scan of his abdomen revealed a hernia through the diaphragm. *Id.*

In March 2016, Mr. Censke underwent additional x-rays of his cervical spine after complaining of neck pain radiating to his left forearm and wrist. (Dkt. 100-27.) The x-rays showed mild degenerative disc disease. (Dkt. 100-28.)

### E. The United States Designated Medical Expert

The United States has designated Dr. John Baldea, a physician from Indiana University Health and the Indiana University School of Medicine, as its expert witness in this lawsuit. (*See* Dkt. 100-29.) After reviewing Mr. Censke's medical records, Dr. Baldea has concluded that the medical care Mr. Censke received from the Bureau of Prisons following the alleged assault "was appropriate, timely, and in accordance with the standard of care." *Id.* at 2.

### F. Mr. Censke has not Designated a Medical Expert

Mr. Censke has not designated a medical expert. At his deposition, Mr. Censke testified that he received some medical training during his time in the Michigan Army National Guard. (Dkt. 100-1 at 21-22.) However, he also testified that he does not have a medical degree and has not been trained to provide medical diagnoses. *Id.* In any event, Mr. Censke has not attempted to designate himself as a medical expert for this lawsuit.

### III. DISCUSSION

Mr. Censke is proceeding on a medical negligence claim against the United States under the Federal Tort Claims Act ("FTCA"). He claims that he was in excruciating pain for three days while in restraints following the alleged assault, and that the medical staff only made cursory evaluations each time they treated him. (Dkt. 75 at 5.) He also claims that the medical staff failed to provide adequate treatment for the scars on his wrist, his traumatic brain injury, his diaphragmatic hernia, and neuropathy. *Id.* at 6-9.

### A. FTCA Standard

The FTCA is a limited waiver of the United States sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of negligence of United States employees. *See United States v. Muniz*, 374 U.S. 150 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b).

State tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008).

### B. Indiana Medical Negligence Standard

To prevail on a medical negligence claim under Indiana tort law, the plaintiff is required to prove three elements: (1) that the medical professional owed a duty to the plaintiff; (2) that the medical professional breached that duty; and (3) that the breach proximately caused the plaintiff's injuries. *Siner v. Kindred Hosp. Ltd. Partnership*, 51 N.E.3d 1184, 1187 (Ind. 2016).

It is well settled that expert testimony is necessary to establish whether the medical professional has or has not breached their duty of care "except in those cases where deviation from the standard of care is a matter commonly known by lay persons." *Glock v. Kennedy*, 133 N.E.3d 768, 778 (Ind. Ct. App. 2019) (citing *Culbertson v. Mernitz*, 602 N.E.2d 98, 103-04 (Ind. 1992)). An expert is not necessary, for example, in cases involving the standard for informed consent, *Glock*, 133 N.E.3d at 780, or the failure to remove medical devices from the patient's body during surgery, *Simms v. Schweikher*, 651 N.E.2d 348, 350 (Ind. Ct. App. 1995).

### C. Mr. Censke's Medical Claim

The uncontradicted evidence shows that Mr. Censke received continuous medical care in the days and months following the alleged assault. The medical staff at his facility repeatedly cleansed and dressed the abrasions on his wrists that were caused by his hand restraints, and they ordered that the restraints be loosened when they observed swelling in his wrists. They also recorded their observations about symptoms of a potential traumatic brain injury, such as headaches, dizziness, and flashes of light, and checked to determine whether injuries to his torso were causing difficulty breathing. Mr. Censke continued to receive medical treatment for neuropathy and a diaphragmatic hernia throughout his time in federal custody.

Unlike cases involving informed consent or the failure to remove medical devices from a patient's body during surgery, the standard of care for concussions, neuropathy, and diaphragmatic hernias is not readily apparent to a lay person. Thus, under controlling precedent from the Indiana Supreme Court and Indiana Court of Appeals, Mr. Censke needed to present expert testimony to establish the applicable standard of care, that the medical staff's conduct fell below this standard of care, and that their failure to conform to the standard of care caused an injury. His failure to do so is fatal to his claim for medical negligence.

Mr. Censke's argument that the inadequacy of his treatment would be obvious to a layperson, thereby eliminating the need for him to provide an expert witness, is unpersuasive. This argument would be somewhat more persuasive if his medical conditions had been completely ignored, as a layperson would likely understand that *some* treatment is required for serious or moderately serious medical conditions. However, given that Mr. Censke was treated for these injuries, and that a medical expert has characterized this treatment as conforming to the applicable standard of care, the record does not support a reasonable inference that the medical staff

8

committed medical negligence. Accordingly, the Motion for Partial Summary Judgment is **granted**.

## IV. CONCLUSION

The United States Motion for Partial Summary Judgment as to medical negligence, Dkt. [100], is **GRANTED**, and the medical negligence claim is **DISMISSED**.

**SO ORDERED**.

Date: 2/3/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Thomas Andrew Censke
P.O. Box 446
Negaunee, Michigan 49866

J. Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
TKirklin@usa.doj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov