# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| THOMAS ANDREW CENSKE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:16-cv-02761-TWP-MJD |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) ) |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AS TO BATTERY

This matter is before the Court on Plaintiff Thomas Andrew Censke's ("Mr. Censke") Cross-Motion for Summary Judgment on his Battery Claims. (Dk. 108). Mr. Censke, a former federal prisoner, initiated this lawsuit against Defendant, the United States of America ("Government") under the Federal Tort Claims Act. He alleges that during his incarceration, correctional officers committed three batteries against him and that the prison medical staff failed to adequately treat his injuries. For the reasons explained below, the motion is **GRANTED in part and DENIED in part**.

## I. LEGAL STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Federal Rule of Civil Procedure 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Community Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.  BACKGROUND

On December 16, 2013, Mr. Censke and his cellmate, Loren Hamlin ("Mr. Hamlin"), were involved in a physical altercation with correctional officers in their cell at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"). (*See* Dkt. 100-1 at 67-97; Dkt. 100-6; Dkt. 109-1.)

Sometime between 9:00 p.m. and 10:00 p.m., Officer Gallion and Officer Penman were walking down the range and conducting evening count. (Dkt. 100-1 at 76.) During evening count, the prisoners must stand as the officers walk past their cell so they are more easily observed. (Dkt. 100-6 at 18-19.)  When Officer Gallion and Officer Penman walked past the cell of Mr. Censke and Mr. Hamlin, Mr. Censke stood up from his chair. *Id.* at 14.  Mr. Hamlin, however, failed to stand up from his bed because he was listening to headphones and was not aware that count was being conducted. *Id.*  When the officers got his attention, Mr. Hamlin stood up to be counted. *Id.*  At that same time, Mr. Censke sat back down. *Id.*

Officer Gallion and Officer Penman then entered the cell. *Id.*  Officer Gallion approached Mr. Censke aggressively and told him to stand up. *Id.*; Dkt. 100-1 at 78.  Mr. Censke replied in an angry tone that he had just stood up a moment ago. (Dkt. 100-1 at 78; Dkt. 100-6 at 14.)  Officer Gallion then got in Mr. Censke's face, slapped a piece of paper out of his hand, and said, "No, you

2

didn't." (Dkt. 100-1 at 78; Dkt. 100-6 at 14-15.) Mr. Hamlin told Officer Gallion to leave Mr. Censke alone. (Dkt. 100-6 at 15.) Officer Gallion told Mr. Hamlin to "Shut up," and insulted him with sexist language. *Id.* Officer Gallion began to crowd Mr. Hamlin, who then pushed Officer Gallion in the chest, and the incident escalated into a boxing match between the two men. *Id.* at 26-27. During this time, Mr. Censke remained toward the back of the cell and did not involve himself in the physical altercation. *Id.* at 27; Dkt. 100-1 at 82-83.

Officer Penman responded to the boxing match by spraying Mr. Hamlin with a chemical agent. *Id.* at 29-30; Dkt. 100-1 at 83-85. Due to the volatile nature of the chemical spray, and the confined space where it was deployed, both the prisoners and the correctional officers were hit. (Dkt. 100-1 at 84; Dkt. 100-6 at 29-30.) The officers left the cell, and Mr. Censke and Mr. Hamlin remained inside. *Id.*

There is conflicting evidence about what happened next. According to Mr. Censke and Mr. Hamlin, they both laid down on their stomachs with their hands locked beyond their backs for cuffing. (Dkt. 100-1 at 93; Dkt. 100-6, pp. 30-32.) A group of correctional officers gathered outside the cell and prepared to take the men into custody. *Id.* At that time, they heard one or more of the officers say, "Make sure you hurt them." (Dkt. 100-1 at 90; Dkt. 100-6 at 31.) The officers entered the cell, struck Mr. Censke and Mr. Hamlin, and handcuffed them. (Dkt. 100-1 at 91; Dkt. 100-6 at 32.) Then, after Mr. Censke and Mr. Hamlin were in handcuffs and complying with the officers' orders, the officers continued to beat Mr. Censke and Mr. Hamlin for approximately two minutes. (Dkt. 100-1 at 93-98; Dkt. 100-6 at 32, 41.) Mr. Hamlin saw a group of officers repeatedly punch Mr. Censke and twist one of his arms. He heard Mr. Censke repeatedly cry out in pain. *Id.* at 32-33; *see also id.* at 42 ("I've never heard a man cry out like that before."). Mr. Censke states he was repeatedly kicked during this encounter as well. (Dkt. 108-1

3

at 14.) After the beatings, the officers took the men to the shower for decontamination. (Dkt. 100-6 at 33.)

The Government has not produced any testimony or sworn statements to contradict this evidence. However, it has produced a one-paragraph memorandum written by Officer Snowden on the day of the incident. (*See* Dkt. 109-1.) The memorandum states the following:

> On December 16, 2013, at approximately 9:23 p.m., … I responded to a call for assistance to the F2 housing to cell 216. Upon entering the housing unit, both inmates were secured in the cell and refusing [to] respond, and comply with orders. At this time we were ordered to enter the cell where both inmates became combative. I assisted in securing inmate Censke, Thomas … on the ground, and the application of hand restraints. Once … Censke was secured I then assisted in escorting him to the F2 housing unit showers for immediate decontamination.

*Id.*

Following the decontamination shower, Mr. Censke was taken to a lieutenant's office and gave a recorded statement about the incident. (Dkt. 100-1 at 152-67.) During this statement, Mr. Censke described the incident with the officers, which was materially consistent with his deposition testimony. *Id.* at 152-53, 159-60. He also stated that he planned to seek compensation for his injuries and discussed his history of post-traumatic stress disorder as a result of childhood sexual trauma. *Id.* at 154, 160. Finally, he threatened to go to the homes of federal correctional officers to kill them and their family members, and he claimed to have conspired with Timothy McVeigh to commit the bombing of the Oklahoma City Murrah federal building in 1994 (at his deposition, Mr. Censke clarified that he was not involved in the Murrah building bombing). *Id.* 167-168.

Mr. Censke was placed in segregation in the Special Housing Unit ("SHU"). (Dkt. 100-1 at 101.) For approximately three days, he was in shackles and black-box wrist restraints. *Id.* at 103, 108. His wrist restraints were not back-locked, meaning they continued to tighten in response

to pressure from Mr. Censke's wrists. *Id.* at 108; *see also id.* at 159 (Censke informing officers during his video interview that the restraints were not back-locked). As a result, the handcuffs cut into Mr. Censke's wrists, which had to be continually dressed and cleansed by the prison medical staff. (*See* Dkts. 100-7 to 100-16.) The restraints caused pain and discomfort to Mr. Censke's wrists. *Id.*

Mr. Censke was seen by the medical staff ten times before the restraints were removed. (*See* Dkts. 100-7 to -16):

- December 16 at 9:50 p.m.: Mr. Censke was in "unbearable" pain; he complained about the "restraints being tight" and said that he could not feel his fingers. (Dkt. 100-7.)

- December 17 at 12:01 a.m.: According to the nurse: "Restraints tight enough to secure, yet loose enough for adequate circulation. Agitated, shouting. No apparent distress." (Dkt. 100-8.)

- December 17 at 4:00 a.m.: Mr. Censke was agitated but not shouting. (Dkt. 100-9.)

- December 17 at 10:19 a.m.: Mr. Censke was not shouting or agitated. (Dkt. 100-10.)

- December 17 at 6:00 p.m.: Mr. Censke told the nurse that the restraints were too tight, and the nurse noticed dime-sized abrasions on his wrists. (Dkt. 100-11.)

- December 17 at 8:00 p.m.: Mr. Censke told the nurse that the restraints were too tight, and his wounds had to be cleansed and dressed; the nurse believed that Mr. Censke was manipulating the restraints to make them appear tight and noted that Mr. Censke was loud, agitated, and insulting. (Dkt. 100-12.)

- December 17 at 10:00 p.m.: Mr. Censke had swelling in both hands. He was "agitated but cooperative." (Dkt. 100-13.)

- December 18 at 12:34 a.m.: Swelling in both hands. (Dkt. 100-14.)

- December 18 at 2:24 a.m.: No pain or bleeding. (Dkt. 100-15.)

- December 18 at 9:51 a.m.: Nurse noted the "restraints are too tight…, as the wrists have become edematous." Mr. Censke's hands were numb and swollen. (Dkt. 100-16.)

### III. DISCUSSION[1]

In his Amended Complaint, Mr. Censke claims that he was subjected to three separate batteries on or around December 16, 2013. First, he was battered when Officer Penman deployed a chemical spray to break up the fight between Officer Gallion and Mr. Hamlin. Second, he was battered when a group of correctional officers re-entered the cell and beat him for two minutes while he was already compliant and in restraints. Third, he was battered when correctional officers left him in shackles and painful black-box restraints for three days while he was in segregation in the SHU. (Dkt. 74.)

Mr. Censke argues that summary judgment should be granted as to his battery claims based on his and Mr. Hamlin's depositions. (*See* Dkt. 108 at 25.) In response, the Government makes two arguments. First, it argues that Mr. Censke's cross-motion should be denied because it does not comply with the requirements of S.D. Ind. Local Rule 56-1. Second, it argues that there is a genuine issue of material fact as to whether correctional officers used reasonable force under the totality of the circumstances in light of the memorandum drafted by Officer Snowden.

---

[1] The Government objects to a handwritten letter from prisoner Jeffrey Malone, (*see* Dkt 108-1 at 22), that Mr. Censke submitted with his cross-motion for summary judgment because the letter is not sworn under penalties of perjury. (Dkt. 110 at 11.) This objection is **SUSTAINED**.

Mr. Censke later filed a Motion for Supplement to Record on Summary Judgment, (Dkt. 114), with Mr. Malone's sworn affidavit, which states that he was housed next to Mr. Censke and Mr. Hamlin and on December 16, 2013, he heard "two inmates that were in that cell locked in screaming for them to stop kicking them at which time me and my [cellmate] started kicking the door because the Lieutenant allowed it." (Dkt. 115-1 at 3, para. 14.) The motion to supplement the record, (Dkt. [114]), is **GRANTED to the extent** that the Court has reviewed the affidavit before ruling on the summary judgment motion. However, because the affidavit is merely cumulative of other evidence in the record, *i.e.*, the sworn statements from Mr. Censke and Mr. Hamlin, and because the Court, at summary judgment, considers the evidence in favor of the non-moving party, the affidavit does not affect the resolution of Mr. Censke's cross-motion for summary judgment.

A.      **Compliance with Local Rules**

S.D. Ind. Local Rule 56-1 sets forth the procedural requirements for a motion for summary judgment in this District. The rule requires, among other things, that the moving party submit an opening brief with a section titled "Statement of Material Facts Not in Dispute." S.D. Ind. Local Rule 56-1(a). Also, the parties must support each fact they assert in their brief with a citation to admissible evidence that includes the page or paragraph number or otherwise similarly specifies where the relevant information can be found in the supporting evidence.

The Government argues that the Court should deny the motion based on Mr. Censke's failure to adhere to these requirements. The Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009); *see also Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). "It does not follow, however, that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013); *see Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("We have not endorsed the very different proposition that litigants are entitled to expect strict enforcement by district judges. Rather, it is clear that the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." (citation and quotation marks omitted)).

The Court exercises its discretion for leniency. Although Mr. Censke's cross-motion for summary judgment does not strictly adhere to each and every requirement of S.D. Ind. Local Rule 56-1, it nevertheless provides the Government and the Court with sufficient notice of his arguments

7

and the evidence in the record on which he relies. Accordingly, the Court will proceed to rule on the merits of Mr. Censke's cross-motion for summary judgment.

**B.     Merits**

**1.     Federal Torts Claims Act ("FTCA") Standard**

The FTCA is a limited waiver of the Government's sovereign immunity that "permits suits against the Government for personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to the plaintiff." *Reynolds v. Government*, 549 F.3d 1108, 1112 (7th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)). Plaintiffs may sue the government under the FTCA for a battery committed by an "investigative or law enforcement officer." *Millbrook v. Government*, 569 U.S. 50, 55 (2013) (quoting 28 U.S.C. § 2680(h)). State tort law of the state where the tort allegedly occurred, in this case Indiana, applies to claims under the FTCA. *Reynolds*, 549 F.3d at 114.

**2.     Battery Under Indiana Tort Law**

Under Indiana tort law,

> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (quoting Restatement (Second) of Torts § 13 (1965)).

Under the Indiana Tort Claims Act ("ITCA"), government employees are shielded from liability for personal injury claims if the plaintiff's injury resulted from "the adoption and enforcement of or failure to adopt or enforce: a law (including rules and regulations)." Ind. Code

8

§ 34-13-3-3(8)(A). However, law enforcement officers are not shielded from liability for battery when their conduct amounts to excessive force. *Wilson v. Isaacs*, 929 N.E.2d 200, 204 (Ind. 2010).

The Government has raised government immunity under the ITCA as an affirmative defense. (Dkt. 110 at 12.) Government immunity is narrowly construed "because it provides an exception to the general rule of liability." *Mundia v. Drendall Law Office, P.C.*, 77 N.E.3d 846, 854 n. 11 (Ind. Ct. App. 2017). In support of this affirmative defense, the Government argues "this case hinges on whether the BOP officers acted *unreasonably* in their use of force against Mr. Censke." (Dkt 110 at 12) (emphasis added) (citing Ind. Code 35-41-3-3(c) ("a law enforcement officer is justified in using reasonable force if the officer reasonably believes that force is necessary to enforce a criminal law or effect a lawful arrest).

### 3. Chemical Spray

A reasonable finder of fact could conclude that Officer Penman acted reasonably when he deployed his chemical spray in Mr. Censke's cell. The uncontradicted evidence shows that Mr. Hamlin was engaged in a boxing match with Officer Gallion and that Officer Penman deployed the chemical spray to gain control of the situation and prevent further violence. Given the volatile nature of this chemical spray, and the confined space where it was deployed, all four men—the two prisoners and the two correctional officers—were hit.

Under these circumstances, a reasonable finder of fact could conclude that Officer Penman's use of chemical spray was a reasonable response to a rapidly escalating episode of violence between a prisoner and a correctional officer. The need for force was clear and the force itself was unlikely to be fatal or cause permanent injury. To be sure, Mr. Censke suffered collateral damage despite the fact that he had not engaged in violence against either of the officers. But the Court cannot conclude as a matter of law that deploying the chemical spray was unreasonable.

This is a fact-sensitive inquiry that must be resolved by the finder of fact at trial. Accordingly, the motion for summary judgment is **denied** as to this claim.

### 4. Removal From Cell

Moving next to the removal of Mr. Censke from the cell, there is conflicting evidence about what occurred. Mr. Censke and Mr. Hamlin testified that the officers had already placed them in wrist restraints before beating them for approximately two minutes. Before the beatings occurred, the correctional officers announced their intention to "hurt them." However, there is other evidence in the record that Mr. Censke and Mr. Hamlin were combative up to the moment they were removed from the cell and that they were not beaten while they were in restraints. This is a genuine issue of material fact that must be resolved by the finder of fact at trial. Accordingly, the motion for summary judgment is **denied** as to this claim as well.

### 5. Wrist Restraints and Shackles

Finally, the Court considers whether it may have been reasonable for correctional officers to place Mr. Censke in shackles and painful black-box wrist restraints for three days while he was locked inside a segregated cell in the SHU. The Government has not met its burden of showing that this use of force may have been reasonable under the narrow government immunity exception provided for in the ITCA.

Construing the evidence in the light most favorable to the Government, the Court finds that Mr. Censke was combative when he was removed from his cell and made threatening comments during the video interview shortly thereafter. Locking Mr. Censke in a segregated cell in response to this behavior was not unreasonable.

However, the Government has not articulated a reasonable basis for placing Mr. Censke in shackles and painful black-box wrist restraints for the next three days when he was already locked

inside this segregated cell. There is no evidence that this cage-within-a-cage was necessary to prevent Mr. Censke from harming himself or others. The staff and the inmate population were already protected from Mr. Censke by virtue of the fact that he was locked in a cell by himself, and there is no evidence that the restraints were necessary to prevent Mr. Censke from engaging in self-harm.

Further, Mr. Censke did not exhibit violent behavior toward the medical staff during any of the ten interactions they had with him over the next few days. The fact that Mr. Censke was occasionally "loud" and "agitated" during these interactions did not provide a reasonable basis to leave him in painful restraints for three days—even after he lost feeling in his fingers, experienced persistent swelling in his wrists and hands, and developed painful dime-sized abrasions on his wrists. Finally, if the Government's goal had been to protect the medical staff during these interactions, the correctional staff could have ordered Mr. Censke to present his wrists in the cuff port of his cell before the medical staff entered. The Government has not attempted to explain why it did not employ this modest security measure or why such periodic restraints were unfeasible.

The Government has not met its burden on its government immunity defense. Accordingly, Mr. Censke's motion for summary judgment on this claim is **granted**.

## IV. <u>CONCLUSION</u>

Mr. Censke's Motion for Partial Summary Judgment as to battery, Dkt. [108], is **GRANTED in part and DENIED in part**. His battery claims against the Government arising from the use of chemical spray and his removal from his cell shall proceed to a bench trial. His damages award for the battery involving the use of shackles and black-box wrist restraints shall be determined at this bench trial as well.

Mr. Censke's motion to supplement the record, Dkt. [114], is **GRANTED to the extent** that the Court has reviewed the affidavit before issuing this Order.

Given the difficulties of late-stage litigation, the Court **GRANTS** Mr. Censke's Motion for Appointment of Counsel for Trials, Dkt. [112]. The Court will attempt to recruit counsel on his behalf before the trial or settlement conference.

The Court **ORDERS** the Government to provide an updated Settlement Conference Notice by **Friday, April 1, 2022**. (*See* Dkt. 67 at 4.)

**SO ORDERED**.

Date: 2/25/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Thomas Andrew Censke
P.O. Box 446
Negaunee, Michigan  49866

J. Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
TKirklin@usa.doj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov