## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THOMAS ANDREW CENSKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-02761-TWP-MJD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND ORDER FOLLOWING BENCH TRIAL

Thomas Andrew Censke ("Mr. Censke") is a former federal prisoner who was incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). He filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. ("FTCA"), alleging batteries were committed against him by USP Terre Haute correction officers.  The Court conducted a bench trial on January 30 and 31, 2023. Mr. Censke appeared in person and by counsel Harmony Mappes, Emanuel McMiller, Jason Rauch and Elizabeth Charles. The United States of America appeared by Assistant U.S. Attorneys J. Taylor Kirklin and Justin Olson. Federal Rule of Civil Procedure 52(a) directs the Court to separately set out its findings of fact and conclusions of law in an opinion or a memorandum of decision.  The following are the Court's findings of fact and conclusions of law as required by Rule 52(a).

## I.      FINDINGS OF FACT

The following facts are based on the Court's credibility determinations of the various witnesses' testimonies, the parties' Joint Stipulated Facts for Trial (Dkt. 166), and the exhibits admitted into evidence.  To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

On December 16, 2013, Mr. Censke was a federal inmate in the custody of the federal Bureau of Prisons ("BOP") at USP Terre Haute. (Dkt. 166 at ¶ 1.)  He was housed in Cell 216 of the F2 housing unit, and his cellmate was Loren Hamlin ("Mr. Hamlin").  *Id.* at ¶ 2.  Prior to December 2013, Mr. Censke had been diagnosed with anxiety stress disorder and post-traumatic stress disorder.[1] (Dkt. 171 at 27.)

A.    **Pepper Spray**

At approximately 9:20 p.m. on December 16, 2013, correction officers Robert Gallion ("Officer Gallion") and David Penman ("Officer Penman") were conducting evening count in the F2 housing unit.  (Dkt. 166 at ¶ 4.)[2]  Evening count is a "stand-up" count.  The purpose of the stand-up count is to make certain the inmates are healthy and accounted for, and each inmate is required to stand up as the officers pass his cell.  *Id.* at ¶ 4b.  If an inmate fails to stand up for count, but it is clear to the officers that he is alive and uninjured, the officers are supposed to move on, and the inmate may be written up later for a conduct violation. (Dkt. 171 at 143, 224.)

When Officers Gallion and Penman approached Cell 216 and announced they were conducting evening stand-up count, Mr. Censke and Mr. Hamlin did not stand up.  *Id.* at 126, 155. Mr. Hamlin was laying on the top bunk listening to music, and Mr. Censke was seated at a desk, facing away from the cell door reviewing legal paperwork.  *Id.* at 126, 155-56, 256.

Officers Gallion and Penman then entered Cell 216, purportedly to check on Mr. Censke's well-being and reiterate the need for him and Mr. Hamlin to stand up for count. (Dkt. 171 at 126, 155-56; Dkt. 166 at ¶ 4c).  Mr. Censke responded that he had already stood up for count.  (Dkt.

---

[1] When Mr. Censke was a child he was held hostage while assailants threatened, raped and cut his mother. (Dkt. 171 at 27-28.)

[2] The parties have stipulated that Officers Penman and Gallion were "investigative or law enforcement officer[s]" for purposes of 28 U.S.C. § 2680(h). (Dkt. 166 at ¶ 13c and g.)

171 at 145.)  At that point, the officers knew that Mr. Censke was alive and not in distress.  *Id.* at 145, 162.  Rather than leave the cell and continue with count, as they were trained, the officers ordered Mr. Censke to stand up several more times, which Mr. Censke refused to do.  *Id.* at 145-46.  Officer Gallion slapped the piece of paper out of Mr. Censke's hand. (Dkt. 172 at  8.)

Mr. Hamlin then jumped down from his bunk and intervened.  (Dkt. 171 at 58, 126-26, 156-57; Dkt. 172 at 8-10, 32.)  He told Officer Gallion to leave Mr. Censke alone.  (Dkt. 172. at 8-9.) Mr. Hamlin and Officer Gallion engaged in a verbal altercation, which escalated to a physical altercation when Mr. Hamlin shoved Officer Gallion. *Id.* Mr. Censke did not engage in the altercation between Mr. Hamlin and Officer Gallion.  (Dkt. 171 at 60-61, 164-65; Dkt. 172 at 9.)

In an effort to break up the physical altercation between Mr. Hamlin and Officer Gallion, Officer Penman deployed oleoresin capsicum spray ("pepper spray").  (Dkt. 171 at 62, 124-30, 157, Dkt. 259.)  Officer Penman deployed his pepper spray twice.  (Dkt. 171 at 130.)  The first spray was aimed at Mr. Hamlin and hit both Mr. Hamlin and Officer Gallion. *Id*. at 147. The second spray was aimed directly at Mr. Censke and hit Mr. Censke in the face.  *Id*.

Immediately after deploying the pepper spray, Officer Penman grabbed Officer Hamlin by his belt and pulled him toward the door. *Id.* at 130-31, 157; Dkt. 166 at ¶ 4f. The officers left the cell, locked the door, and called for backup. (Dkt. 171 at 31.)

The effects of the pepper spray were "pretty severe." (Dkt. 171 at 33.)  The spray burned Mr. Censke's skin, his eyes, and his lungs, and made it difficult for him to breathe. *Id.* at 32. Mr. Censke and Mr. Hamlin washed their eyes and face in the sink.  *Id.* at 32-33, Dkt. 172 at 10.

**B.    Cell Extraction**

BOP policy provides that "[s]taff must obtain a video camera immediately and record any use of force incident, unless it is determined that a delay in resolving the situation would endanger

the inmate, staff, or others, or would result in a major disturbance or serious property damage." (Tr. Exhibit 101 at DEF001820.)  BOP staff did not grab a video camera, which was located in the Lieutenant's Office, to record the cell extraction.  (Dkt. 171 at 233.)  Lieutenant Everett Snyder grabbed a large cannister of pepper spray from the Lieutenant's Office before responding to the F2 unit, but he did not grab the video camera.  *Id.*[3]

Within minutes of Officer Penman's and Officer Gallion's retreat from Cell 216, approximately 19 correctional officers and staff responded to the F2 unit.  (Tr. Exhibit 102.)  As the officers and staff congregated outside Cell 216, Mr. Censke and Mr. Hamlin laid down on the floor in preparation for the cell extraction.  (Dkt. 171 at 33-34; Dkt. 172 at 10.)

The Court credits Mr. Censke's testimony that when officers entered Cell 216, he laid on the floor in the prone position, on his stomach and put his hands behind his back. (Dkt. 171 at 33-34.) The Court credits Mr. Censke's testimony that officers struck him while he laid face down on the concrete floor of his cell. *Id*. at 35.  Mr. Hamlin observed the officers wrestling around with Mr. Censke twisting his arms as they were trying to apply handcuffs and Mr. Censke called out "ow". (Dkt. 172 at 12-13).  Mr. Hamlin observed the officers surrounding Mr. Censke but he could not tell what was going on.  *Id*.  Mr. Hamlin did not see whether Mr. Censke was struck by officers during the cell extraction, but he heard Mr. Censke cry out "like he was in great pain." (Dkt. 172 at 13.)

After the cell extraction, Mr. Censke and Mr. Hamlin were taken to a shower for decontamination from the pepper spray.  (Dkt. 166 at ¶ 4j.)

---

[3] In the absence of an objective recording of what transpired inside Cell 216 during the cell extraction, the Court makes its findings of fact after giving due consideration to witness testimony, staff reports, and other evidence.

At approximately 9:50 p.m., Mr. Censke was evaluated by the medical staff. (Dkt. 166. at ¶ 9; Tr. Exhibit 103; Tr. Exhibit 105.) The medical records from this evaluation confirm that Mr. Censke reported "pain in his neck," and medical staff observed "[r]edness to posterior neck," and a "[s]mall amount of diffuse light redness to middle back." (Tr. Exhibit 151 at 1.) The medical record also states there was "[n]o redness, bruising or swelling noted elsewhere including dorsum of hands, arms, knees, trunk, and face." *Id.*

**C.**   **Black-Box Restraints in the SHU**

Following the medical assessment, Mr. Censke sat for a video recorded interview in the hallway outside the Lieutenant's Office. (Tr. Exhibit 401.) In that interview, Mr. Censke made violent threats against BOP staff, shouting that he would "slit [their] throats" and "kill . . . their families." *Id.* Mr. Censke spoke coherently and no visible injuries can be seen on the video. *Id.*

Mr. Censke was then taken to the Special Housing Unit ("SHU"), where he changed clothes and was placed into black-box, ambulatory restraints ("black-box restraints"). (Dkt. 166 at ¶¶ 6, 10; Dkt. 171 at 114-15.) The black-box restraints consisted of handcuffs, a black box that fits over the handcuffs, a belly chain that's connected to the black box, and leg shackles. (Dkt. 171 at 39-41, 91.) Mr. Censke had "almost no mobility at all." *Id.* at 39. The black-box restraints forced his wrists to be approximately an inch or two apart with his palms facing each other. *Id.* at 39-40. He could not rotate his palms up or down or in any other direction; they remained stuck mere inches apart. *Id.* The black box and the belly chain forced Mr. Censke's hands low by his waist and prevented him from rotating his wrists. *Id.*

BOP officials left Mr. Censke in black-box restraints and placed him inside a segregated "dry cell" for 38 hours—from 10:00 p.m. on December 16, 2013, until 12:00 pm on December 18, 2013. (Dkt. 166 at ¶ 10; Tr. Exhibit 404.)

The dry cell had no sink, no toilet, no bed, and no clock.  (Dkt. 171 at 42.)  The lights were constantly illuminated.  *Id.* at 42.  Mr. Censke was given a one-inch foam mattress, which was placed directly on the floor.  *Id.* at 43.  It is unclear why Mr. Censke was placed in a dry cell, rather than a cell with a bed, a toilet, and other amenities typically found in SHU cells that are meant for long-term housing.

While Mr. Censke was in the black-box restraints lifting his arms was "excruciatingly painful." (Dkt. 171 at 40.)  He could work the belly chain up his body in order to take a drink of milk, but eating was "extremely difficult and more painful than the reward of food." *Id.* at 40, 43. It was practically impossible for Mr. Censke to use the restroom. *Id.* at 42-43.  He was given a jug to urinate in, but he remained in restraints. *Id.*  Given his large stature, Mr. Censke was not able to negotiate the jug very well, and he ultimately urinated on the floor, which is also where he attempted to sleep. *Id.* at 43.  Because of the restraints, Mr. Censke was only able to sleep out of exhaustion, and even then, it was just a "catnap for a minute." *Id.*

Once placed in the black-box restraints, Mr. Censke immediately felt pain to his wrists. *Id.* at 41.  This pain worsened over time. *Id.*  Medical records show that Mr. Censke complained numerous times that his black-box restraints were too tight. (*See generally.*, Tr. Exhibits 155, 156, 160.)  By 6:00 p.m. on December 17, 2013, he had developed dime-sized abrasions to each wrist. (Tr. Exhibit 155.) At 9:51 a.m. on December 18, 2013, registered nurse Matthew Worthington reported: "RESTRAINTS ARE TOO TIGHT ON THE WRISTS, AS THE WRISTS HAVE BECOME EDEMATOUS." (Tr. Exhibit 160.)  Nurse Worthington loosened the wrist restraints at Mr. Censke's request. *Id.*  However, this merely provided relief to the sides of Mr. Censke's wrists; the top and bottom of his wrists remained confined by the black box, which was not loosened. (*See* Dkt. 171 at 48 (Censke testifying that the restraints could be loosened so that they

were more "oblong," but that they were still rubbing on his wrists; this loosening provided "a little bit of alleviation, but after a point, you get none.").)

At 4:00 p.m. on December 17, 2013, BOP officials ordered that Mr. Censke must remain in black-box restraints until they "had the desired calming effect," which included "speak[ing] to the lieutenant in an appropriate manner." (Tr. Exhibit 133 at DEF001582.) However, Mr. Censke was not told that he needed to calm down and speak to the lieutenant in an appropriate manner in order to get the black-box restraints removed. Nor did BOP staff tell Mr. Censke when they would remove these restraints or let him out of the dry cell. (Dkt. 171 at 44.)

Prison staff checked on Mr. Censke every 15 minutes while he was in black-box restraints. (Tr. Exhibit 404.) The log sheet documenting these checks shows that Mr. Censke did not lay down for over 20 hours. *Id.* He repeatedly refused food and urinated on the floor. *Id.* The log sheet does not indicate that Mr. Censke slept during the 38 hours he was in restraints. *Id.* Mr. Censke was consistently "yelling," for the first 24 hours; but once his restraints were loosened, he was calm for hours at a time, with only occasional instances of "yelling." *Id.*

On December 23, 2013, ten days after the incident, Mr. Censke was again evaluated by medical staff, who reported a "[l]arge fading light yellow bruise" to Mr. Censke's right temple area. (Dkt. 166 at ¶ 12; Tr. Exhibit 161). Medical staff also reported wounds to each of Mr. Censke's arms above the wrists. *Id.* The wounds were approximately one inch in diameter and were scabbed over. *Id.* Mr. Censke reported pain to his neck and soreness and pain to his left ribs (although he had a history of pre-existing neck pain). (Tr. Exhibits 142, 147-49; Dkt. 171 at 109.)

D.   **Dr. Baldea's Expert Testimony**

Dr. John Baldea ("Dr. Baldea"), an expert in family medicine with a specialty in primary sports medicine, testified as an expert witness for the Government (Dkt. 172 at 40-87.)

1.      __Neuropathy__

Mr. Censke currently suffers from "a mild sensory ulnar neuropathy and a mild median neuropathy," commonly referred to as carpal tunnel syndrome. (Dkt. 172 at 48.) This finding is based on Dr. Baldea's opinion following review of an electromyography ("EMG") that was performed on Mr. Censke in May 2015. [*Id.* at 304-05; Tr. Exhibit 170]. The EMG showed "a mild sensory . . . median neuropathy on the left [wrist], [and] a possible ulnar neuropathy on the right [wrist]." (Dkt. 172 at 55; Tr. Exhibit 170 at DEF000698.)

Symptoms of median neuropathy include "numbness, tingling, pain in the thumb, index finger, middle finger, and the radial aspect of the ring finger, mostly on the palmar side of the hand. You can have weakness with grip strength, difficulty holding objects. If it's severe, you can get atrophy of the thenar eminence, which is the muscle [at the base of the thumb]." (Dkt. 172 at 56.) Symptoms of ulnar neuropathy are "[p]retty similar" but are found at different locations. *Id.* at 57.  They include, "numbness, tingling, pain starting on the ulnar aspect of the wrist and going to the small finger, little finger, and then the ulnar aspect of the ring finger." *Id.*  In severe cases, patients may experience, "difficulty with A-B duction, which is spreading the fingers; and A-D duction, which is closing the fingers together." *Id.*

Mr. Censke's neuropathies are chronic conditions that were likely caused by repetitive stressors over a prolonged period of time. *Id.* at 55-56. According to Dr. Baldea, "It takes time and repeated exposure, repeated pressure, repeated lifting, strain to the area to cause a chronic neuropathy rather than an acute neuritis." *Id.* at 58.  Thus, Dr. Baldea opined that Mr. Censke's neuropathies were not caused by wearing the black-box restraints for 38 hours in December 2013. *Id.* at 58-59. Instead, these neuropathies developed from cumulative stresses to the nerves "over the years, and not an acute onset." *Id.* at 58. Further, the medical records show that Mr. Censke

had reported these same symptoms "years before the incident [in December 2013]." *Id.* at 59 (referencing Tr. Exhibit 143, Censke medical record from November 16, 2010.)

### 2.    <u>Diaphragmatic Hernia</u>

The batteries in December 2013 did not cause Mr. Censke to experience a diaphragmatic hernia, or a "hole in the diaphragm." *Id.* at 61-62.  This finding is based on Dr. Baldea opinion that he "did not see any evidence in the medical records that Mr. Censke had any severe abdominal pain.  He had no shortness of breath, no painful breathing, was not coughing up blood, did not have any bruising on the abdominal wall." *Id.* at 62 (referencing Tr. Exhibit 151, medical record immediately following cell extraction).  Dr. Baldea opined that Mr. Censke's diaphragmatic hernia, which was documented in a medical record two years later, likely resulted from a separate altercation involving an assault on Mr. Censke by other inmates in 2015. (Dkt. 172 at 63-64) (referencing Tr. Exhibit 173, medical record December 17, 2015).

### 3.    <u>Concussion</u>

Mr. Censke did not suffer a concussion as a result of the cell extraction on December 16, 2013.  (Dkt. 172 at 65.)  Dr. Baldea acknowledged that Mr. Censke was not thoroughly evaluated for a concussion during his medical evaluation immediately following the cell extraction.  *Id*. at 81. However, symptoms of a concussion include "headache; light sensitivity; sound sensitivity; nausea; difficulty sleeping; either insomnia or hypersomnolence, where they're sleeping all the time; loss of appetite; [and] agitation." *Id.* at 64.  Patients with concussions will typically "exhibit difficulties with both short- and long-term memory while they're suffering from the concussion, and that resolves once they are recovered." *Id.* at 67.

In the videos of Mr. Censke speaking to the camera, Dr. Baldea observed that Mr. Censke "did not exhibit the signs and symptoms that I would expect to see in someone who has experienced

a concussion." *Id.* at 65.  To the contrary, "he was quoting exact court cases and statutes by number and by letter without searching for words, without confusion, without the other signs and symptoms that I would expect to see in someone who is suffering from an acute concussion." *Id.* at 67.  Mr. Censke reported "headache, visual disturbance, [and] bright flashes" to the medical staff on January 6, 2014.  (Tr. Exhibit 162.)  These are symptoms of concussion. (Dkt. 172 at 64.)  However, Dr. Baldea stated that "[t]here's nothing in my clinical experience or in the literature documenting a concussion that resulted from an incident two or three weeks prior to the development of symptoms."  *Id.* at 65.  Based on the three-week delay between the cell extraction and the onset of these symptoms, Dr. Baldea opined that these were not symptoms of a concussion. *Id.* at 68.

### 4.   **Skull Crack**

Mr. Censke felt and heard his skull crack while guards stomped and kicked him during the cell extraction.  (Dkt. 171 at 36.)  Dr. Baldea opined that Mr. Censke did not experience a skull fracture. (Dkt. 172 at 65-66.)  If Mr. Censke had experienced a skull fracture, he would have had a hematoma; a loss of mental functioning ranging from a headache to loss of consciousness to death; and bruising or abrasions. *Id.* at 66.  When watching the video interview of Mr. Censke, Dr. Baldea observed that, "Mr. Censke is speaking to the camera, and I did not see any indication of such an incident."  *Id.*

### 5.   **Neck Pain**

Dr. Baldea opined that Mr. Censke's chronic neck pain is the result of "mild degenerative joint disease of the cervical spine and degenerative disc disease." *Id.* at 70.  These conditions result from the "wear and tear of the discs."  *Id.* at 71.  Dr. Baldea opined that Mr. Censke developed these conditions due to the "cumulative effect of multiple incidents, as well as aging", *id.* at 72,

rather than from the allegations giving rise to this lawsuit.  He based this opinion in part on an x-ray taken in March 2016 that was negative for fracture, (*id.* (referencing Tr. Exhibit 176)), and older medical records indicating that Mr. Censke had experienced neck pain as early as 2004. *Id.* (referencing Tr. Exhibits 142-43).

      **6.**      **<u>Hand Restraints</u>**

Dr. Baldea opined that Mr. Censke's acute wrist injuries in December 2013 (*i.e.*, abrasions and swelling) were self-inflicted because he was wearing the restraints "higher up on his forearms than they should have been."  (Dkt. 172 at 49.)  But Dr. Baldea's testimony on this point is not credible.  Dr. Baldea did not know which kind of restraints Mr. Censke was wearing, *Id.* at 83; and he mistakenly believed that Mr. Censke wore traditional handcuffs in the SHU rather than black-box restraints.  Dr. Baldea has never worked in a jail or prison and has not treated an inmate in over a decade.  *Id.* at 79.  He has not been trained or educated about where restraints should sit on someone's wrists.  *Id.* at 75-76.  And his opinion about where restraints should sit on someone's wrists is based in part on what he has seen in movies.  *Id.* at 75.

## II. <u>CONCLUSIONS OF LAW</u>

The Federal Tort Claims Act is a limited waiver of the government's sovereign immunity that "permits suits against the government for personal injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable to the plaintiff." *Reynolds v. Government*, 549 F.3d 1108, 1112 (7th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)). Plaintiffs may sue the government under the FTCA for a battery committed by an "investigative or law enforcement officer." *Millbrook v. Government*, 569 U.S. 50, 55 (2013) (quoting 28 U.S.C. § 2680(h)). The law enforcement

provision applies to all law enforcement officers, including employees of the Bureau of Prisons.
*Id.*.

State tort law of the state where the tort allegedly occurred, in this case Indiana, applies to claims under the FTCA. *Reynolds*, 549 F.3d at 114. Under Indiana law, "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Wilson v. Isaacs*, 929 N.E. 2d 200, 203 (Ind. 2010).

Specifically, under Indiana tort law:

An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (quoting Restatement (Second) of Torts § 13 (1965)). Because battery is an intentional tort, the defendant is only liable if he acted recklessly or with reckless disregard of the consequences. *Turner v. Sheriff of Marion Cnty.*, 94 F. Supp. 2d 966, 994 (S.D. Ind. 2000).

The Government raises government immunity as an affirmative defense under the Indiana Tort Claims Act. (*See* Dkt. 175 at 9.) Under the Indiana Tort Claims Act, law enforcement officers have civil immunity for an injury that resulted from "the adoption and enforcement of or failure to adopt or enforce: a law (including rules and regulations)." But law enforcement officers are not shielded from liability for battery when their conduct amounts to excessive force. *Wilson v. Isaacs*, 929 N.E.2d 200, 204 (Ind. 2010). "A law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." *See Wilson*, 929 N.E.2d at 202 (quoting Ind. Code § 35-41-3-3(c)). If an officer uses unnecessary force his conduct is no longer privileged, and he is answerable for assault and battery. *City of S. Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. Ct. App. 1979).

12

In a bench trial, a district court judge must act as both gatekeeper and fact finder and "must determine both the admissibility of expert evidence under Federal Rule of Evidence 702 and the credibility of the expert witness." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013). In evaluating the testimony of any witness, the trier of fact may consider, among other things: the ability and opportunity the witness had to see, hear, or know the things that the witness testified about; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case. *See* Federal Civil Jury Instructions of the Seventh Circuit, 1.13. Here, the numerous disputes in the testimonies of witnesses presents straightforward credibility questions for the Court to resolve as the finder of fact. *See Gicla v. United States*, 572 F.3d 407, 414 (7th 2009).

Mr. Censke's claims that USP Terre Haute officers committed three batteries against him: (1) a correctional officer sprayed him in the face with pepper spray; (2) a group of correctional officers struck him repeatedly while he laid face down in his cell; and (3) correctional officers placed him in painful block-box restraints for 38 hours while he was locked inside a segregated cell. As a result of the batteries committed by the officers, Mr. Censke testified that he experienced neuropathy, a hernia, concussion, cracked skull, neck pain and wrist pain and injuries. The Court will address each claim in turn.

**Pepper Spray**

**1.     Liability**

Officer Penman battered Mr. Censke by spraying him in the face with pepper spray. Officer Penman sprayed twice and intended to hit Mr. Censke in the face with the second spray,

(Dkt. 171 at 130, 147)[4].  Mr. Censke testified that Being hit with pepper spray was painful and debilitating.  (Dkt. 171 at 32-33.)  The Court concludes that Officer Penman intended to cause a harmful touching, and a harmful touching in fact occurred with respect to Mr. Censke.  *See Mullins*, 865 N.E.2d at 610 (elements of battery).

The Government's argument that Officer Penman did not commit a battery because he acted reasonably in enforcing BOP regulations is unpersuasive.  The Government argues that Officer Penman deployed pepper spray one time to break up the physical altercation between Mr. Hamlin and Officer Gallion and that "the impact of the [pepper spray] on Mr. Censke was incidental to Officer Penman's efforts to regain control of the situation within the cell."  (Dkt. 175 at 11-12 (citing BOP Program Statement, which allows officers to use pepper spray when "the circumstances require an immediate response.").)  However, Officer Penman testified that he deployed pepper spray twice—once against Mr. Hamlin, and a second time against Mr. Censke. (Dkt. 171 at 130, 147.)  The Court credits this aspect of Officer Penman's testimony, and has adopted this testimony into its Findings of Fact.  *Supra* at 3 (citing Dkt. 171 at 130, 147).

It may have been reasonable for Officer Penman to spray Mr. Hamlin in order to end a physical altercation and gain control of the situation in the cell, but it was not reasonable to separately pepper spray Mr. Censke in the face, given that Mr. Censke was not engaged in the physical altercation and did not pose an immediate physical threat to the officers.  *Supra* at 3 (citing Dkt. 171 at 60-61 (Censke testimony), 164-65 (Gallion testimony), Dkt. 172 at 9 (Hamlin

---

[4] Officer Penman testified that he *believed* that he saw Officer Gallion and Mr. Censke "kind of in a wrestling clench" and he ordered Mr. Censke to stop and when he didn't he sprayed Mr. Censke in the face. (Dkt. 171 at 130).  But Officer Gallion testified there was "no argument", but merely a "discussion" between he and Mr. Censke. Officer Gallion was engaged in a physical altercation only with Mr. Hamlin (after Mr. Hamlin jumped down from his bunk) when he was pepper sprayed by Officer Penman. (Dkt. 171 at 162). Officer Penman's version of these events—that Mr. Censke was wrestling with Officer Gallion is not credible.

testimony)); *see also Lee v. James*, 2021 WL 3197514 at *2 (7th Cir. 2021) (deploying pepper spray against an inmate who does not pose a threat to officer safety may constitute excessive force).

Accordingly, the Court concludes that the Government **IS LIABLE** for battery based on Officer Penman's use of pepper spray against Mr. Censke.

### 2.   Damages

Mr. Censke experienced temporary pain and suffering after being pepper sprayed. He washed off some of the pepper spray immediately afterward with water from the sink and took a decontamination shower shortly after the cell extraction. *Supra* at 3-4 (citing Dkt. 171 at 33;Dkt. 166 at ¶4j). Nevertheless, Mr. Censke testified that this temporary pain was "pretty severe" and burned his skin, his eyes, and his lungs, and made it difficult to breathe. *Supra* at 3 (citing Dkt. 171 at 32-33). His testimony on this point was corroborated by Officer Penman, Officer Gallion, and Mr. Hamlin, who all testified that being pepper sprayed is painful and debilitating. (Dkt. 171 at 124, 157-58; Dkt. 172 at 29.)

In a case from the Northern District of Ohio, a jury awarded the plaintiff $1,578.00 in compensatory damages when he was unnecessarily pepper sprayed while restrained on suspicion of vandalism. *Dunn v. Village of Put-in Bay, Ohio*, Case No. 3:02-cv-7252, 2004 WL 169788 at *1 (N.D. Ohio January 26, 2004). The Court concludes that a similar award would fairly compensate Mr. Censke for this significant but temporary injury. Accordingly, the Court awards Mr. Censke **$1,500.00 in compensatory damages** for this battery.

### A.   Cell Extraction

### 1.   Liability

During the cell extraction, a group of officers struck Mr. Censke repeatedly while he laid face down on the concrete floor of his cell. Mr. Censke testified that these strikes were painful.

This evidence shows that the officers intended to cause a harmful touching and that a harmful touching in fact occurred.  *See Mullins*, 865 N.E.2d at 610 (elements of battery).

The Government's argument against liability presupposes that Mr. Censke was not struck during the cell extraction.  (Dkt. 175 at 12-13.)  However, the Court credits Mr. Censke's testimony that he was struck during the cell extraction, as well as Mr. Hamlin's testimony that he heard Mr. Censke cry out in pain during the cell extraction while Mr. Censke was surrounded by BOP officers (and while Mr. Hamlin himself was being struck by BOP officers).  *Supra* at 4 (citing Dkt. 171 at 35, 128; Dkt. 172 at 13. Numerous BOP reports state that Mr. Censke was compliant with the officers' directions to submit to restraints during the cell extraction. (*See* Tr. Exhibits 106, 108, 114, 132, 133.) Mr. Censke did not resist the officers' commands to submit to restraints. (Dkt. 171 at 68.) Operations Lieutenant Charles Wingerd, who was the most senior BOP official present during the cell extraction, confirmed that "once responding staff arrived, Inmate Censke complied with the direction of staff and submitted to the application of hand restraints." during the cell extraction.  (Dkt. 171 at 199, Tr. Exhibit 106 [DEF01586-DEF001587].) Activities Lieutenant Snyder, who was the second most senior BOP official present for the cell extraction, initially testified that Mr. Censke resisted but later clarified that Mr. Censke did not forcefully resist and that officers merely guided Mr. Censke's hands behind his back in a manner that was "gentle" to place him in restraints.  (Dkt. 171 at 244-45.)[5]

The Court also credits Mr. Censke's medical record from an evaluation ten days after the cell extraction, in which the medical staff reported a "[l]arge fading light yellow bruise" to Mr. Censke's right temple area.  *Supra* at 5 (citing Dkt. 166 at ¶ 12; Exhibit 161). This fading

---

[5] Although there is some evidence that Mr. Censke was not compliant during the cell extraction, (*see* Dkt. 171. at 218; Tr. Exhibits 119, 123-25, 127), the Court finds that the preponderance of the evidence supports a finding that Mr. Censke did comply with the officers' commands and was not physically combative.

bruise is circumstantial evidence that Mr. Censke was more likely than not, struck by officers while he laid face down on the concrete floor and corroborates his testimony.

The Government argues that a surveillance video proves Mr. Censke was able to walk minutes after the cell extraction and that he did not have visible injuries to his face during a video interview later that evening. (Dkt. 175 at 12-13 (citing Exhibits 102-06, 404).) Further, Dr. Baldea opined that Mr. Censke did not suffer a concussion or a skull fracture on December 16, 2013. *Supra* at 9-10 (citing Dkt. 172 at 64-67). This evidence may be probative of the extent of Mr. Censke's injuries and, as discussed below, his damages. But this evidence does not persuade the Court that no battery occurred during the cell extraction.

Accordingly, the Court concludes that the Government **IS LIAIBLE** for battery based on the blows BOP officers inflicted on Mr. Censke during the cell extraction.

### 2. Damages

Mr. Censke testified that his pain level after being extracted from the cell was an "eleven" on a scale of 1 to 10. (Dkt. 171 at 36). Like the pepper spray deployed against Mr. Censke in his cell moments earlier, the pain and suffering he experienced when he was battered during the cell extraction was significant but more likely than not, it was temporary. The Court credits Dr. Baldea's expert testimony that Mr. Censke did not suffer a concussion, a skull fracture, or a diaphragmatic hernia, and that his chronic neck pain was a pre-existing condition. *Supra* at 9-10 (citing Dkt. 172 at 64-72). Dr. Baldea could not rule out the possibility that this battery exacerbated Mr. Censke's chronic pain, and the Court finds there is some credible evidence to support the proposition that Mr. Censke's chronic pain as well as his chronic anxiety, were more likely than not exacerbated by the cell extraction. Moreover, the Court also does not credit Mr. Censke's testimony that this event caused or exacerbated chronic migraines.

In determining damages, the Court first looks at *Hendrickson v. Cooper*, a case cited by Censke's counsel. In *Hendrickson*, the plaintiff testified that a correctional officer verbally harassed him and then grabbed him, threw him against a wall, slammed him onto the concrete floor, and pressed his knees into his back. Hendrickson testified that it "hurt pretty bad" and exacerbated previous back and neck problems. *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009). After the attack, officers took Hendrickson to a segregation unit, where he initially refused a nurse's offer to examine him because he was agitated and did not want to deal with prison officials. *Id.* at 890–91. After about an hour, however, Hendrickson told a nurse that he was feeling "pain all over" and requested treatment. *Id.* About a month later, Hendrickson followed up with multiple requests for a transfer to a hospital for an MRI scan and additional care, as the Tylenol and ibuprofen that he was receiving in prison were not providing sufficient pain relief. *Id.* Hendrickson also described for the jury how Cooper's attack increased his back pain. *Id.* Before Cooper's assault, Hendrickson had a "little bit of lower back pain," but this pain became much worse afterwards. *Id.* The Seventh Circuit found that the jury award of $75,000.00 was rationally connected to the plaintiff's evidence of pain and suffering. *Id.* In *Davis v. Thrasher*, No. 1:15-cv-01206-TWP-TAB, 2021 U.S. Dist. LEXIS 10393917 (S.D. Ind. Mar. 31, 2021), this Court found that a correctional officer exercised excessive force against Davis by punching him in the face, and that Davis was injured and incurred pain and suffering from a missing tooth, cracked and chipped teeth, and lacerations to his face, as well as an untreated injury to his knee. *Id.* at *8. This Court awarded Davis compensatory damages in the amount of $35,000.00. *Id.* at *9. Based in part on the expert testimony of Dr. Baldea, the Court concludes that the physical injuries and pain and suffering, and the exacerbation of existing conditions that Mr. Censke experienced, as a result of this second battery, is significantly less than that experienced by

Hendrickson or Davis.  Accordingly, the Court awards Mr. Censke **$5,000.00 in compensatory damages** for this battery.

**B.**      **Black-Box Restraints**

   **1.**      **Liability**

The Court previously granted summary judgment for Mr. Censke as to the Government's liability for placing him in black-box restraints from December 15 until December 18, 2013, while he was locked inside a segregated cell.  (Dkt. 120 at 10-11.)  The Court previously noted that:

> The staff and the inmate population were already protected from Mr. Censke by virtue of the fact that he was locked in a cell by himself, and there is no evidence that the restraints were necessary to prevent Mr. Censke from engaging in self-harm. Further, Mr. Censke did not exhibit violent behavior toward the medical staff during any of the ten interactions they had with him over the next few days. The fact that Mr. Censke was occasionally "loud" and "agitated" during these interactions did not provide a reasonable basis to leave him in painful restraints for three days—even after he lost feeling in his fingers, experienced persistent swelling in his wrists and hands, and developed painful dime-sized abrasions on his wrists.

*Id*. at 11.

The evidence at trial fared no better at showing why—to quote Censke's counsel—the "cage-within-a-cage" restraints were reasonable. At trial, the only evidence presented concerning why Mr. Censke was held in the black-box restraints in a dry cell, within the SHU for 38 hours — was a desire to calm Mr. Censke down, which included having him speak to the lieutenant in an appropriate manner. The Court again concludes that the Government has not articulated a reasonable basis for placing Mr. Censke in shackles and painful black-box wrist restraints for 38 hours when he was already locked inside a segregated cell.  There is no evidence that this cage-within-a-cage was necessary to prevent Mr. Censke from harming himself or others.  Accordingly,

19

the Court concludes that the Government **IS LIABLE** for battery for placing black-box restraints on Mr. Censke for 38 hours while he was locked inside the segregated dry cell in the SHU.

      2.    <u>**Damages**</u>

Mr. Censke has not shown that the black-box restraints caused permanent injuries. The Court credits Dr. Baldea's expert opinion that Mr. Censke's ulnar and median neuropathies were caused by cumulative stress over time, rather than this acute incident. *Supra* at 7-8 (citing Dkt. 172 at 55-58).

However, the injuries Mr. Censke suffered while he remained in black-box restraints for 38 hours were still significant. First, the black-box restraints caused constant pain to his wrists, as evidenced by swelling and abrasions that grew over time, as well as discomfort in keeping his hands and arms in a fixed, immobile position. *Supra* at 6 (citing Tr. Exhibits 155, 156, 160). While he was in the SHU medical staff applied dressings and antiseptic to his writs and observed the need to loosen his restraints. (Tr. Exhibits 157, 159 and 160). Following his release from the SHU, Mr. Censke continued to experience pain in his wrists and it took some time for the wounds to heal. Second, the black-box restraints deprived Mr. Censke of sleep for two consecutive nights, and for more than twenty hours he was unable to lie down. *Supra* at 6 (citing Dkt. 171 at 40, 43). Third, the black-box restraints deprived Mr. Censke of food and nourishment, as eating was "extremely difficult and more painful than the reward of food." *Id.* Fourth, the restraints made it impossible for Mr. Censke to relieve himself into a jug (he was not given the luxury of a toilet), which caused him to urinate on the floor. *Id.* Thus, when Mr. Censke was finally able to lie down on the one-inch foam mattress he was provided, his face was an inch away from the floor on which he had been urinating. *Id.*

Finally, in addition to these physical injuries, the cumulative impact of the black-box restraints caused Mr. Censke to experience a level of humiliation and degradation that a prisoner might fear from "a Soviet gulag in the 1930s," but which has no place in a twenty-first century United States Penitentiary. *Cf. Gillis v. Litscher*, 468 F.3d 488, 489 (7th Cir. 2006) (holding that the temporary conditions of a state prisoner's segregated cell, which lacked a bed, normal meals, and other amenities (but which included a toilet and did not involve ambulatory restraints), was an objectively serious condition under the Eighth Amendment).

The Court is completely unpersuaded by the Government's argument that Mr. Censke's injuries were self-inflicted. It argues that Mr. Censke had to remain in black-box restraints because he lacked "self-control" and needed to first exhibit a "pattern of non-disruptive behavior over a period of time." (Dkt. 175 at 14 (quoting BOP Program Statement 5566.06, §§ 6(f) & 9).) Thus, the Government argues, his "disruptive" behavior amounts to contributory fault under Indiana law. (Dkt. 175 at 15 (citing Ind. Code § 34-51-2-5).) This argument ignores the fact that the black-box restraints themselves caused Mr. Censke to behave erratically. The psychological trauma he endured at the time is apparent from the face of the prison records which demonstrate yelling, kicking, pacing, and an inability to sleep. As the log sheet for Mr. Censke's restraint checks shows, his behavior immediately improved after the restraints were loosened. *Supra* at 7 (citing Tr. Exhibit 404). Mr. Censke's account of the mental pain and suffering is credible, especially considering that he suffered from anxiety and stress disorder and post-traumatic stress disorder at the time he was double restrained in the SHU. Moreover, it was not reasonable for BOP officials to believe that keeping Mr. Censke in painful restraints, depriving him of sleep and nourishment, and forcing him to urinate and lie down on the floor of a small cell would have "the desired calming effect" and improve his behavior. (Tr. Exhibit 404.)

Moreover, Mr. Censke's mental anguish was exacerbated by being placed in a dry cell as opposed to a regular cell with a bed, toilet, and light switch within the SHU. The Seventh Circuit has explained, "[t]he use of dry cells is for the purpose of discovering and securing any contraband smuggled by ingestion into the prison." *Jihad v. Wright*, 124 F.3d 204, 1997 WL 471345, *2 (7th Cir. Aug. 14, 1997). There is no evidence that Mr. Censke was suspected of harboring contraband.

The Court has been unable to find a case involving compensatory damages based on substantially comparable facts. In a recent false imprisonment case, a jury in the District of Colorado awarded $100,000.00 in compensatory damages to a plaintiff who was unlawfully arrested and confined for three days. *Valenzuela v. Police Officer Coleman*, Case No. 1:18-cv-329, 2022 WL 2168116 (D. Colo. Mar. 3, 2022). The $100,000.00 award was for physical or emotional pain and suffering only and was separate from a $35,000.00 award for lost liberty. *Valenzuela v. Police Officer Coleman*, Case No. 1:18-cv-329, 2022 WL 1907773 (D. Colo. Mar. 3, 2022) (special verdict form). The Court notes that Valenzuela was falsely imprisoned, and Mr. Censke was not falsely imprisoned. But, Valenzuela was held in a regular cell and was not held in a black-box restraint (or any type of restraint) during his three day confinement. The Court also considers the award in *Hendrickson* is assessing compensatory damages for the third battery.

Mr. Censke suffered from anxiety and post-traumatic stress disorder in December 2013. He credibly described the physical pain and emotional suffering he endured during the 38 hours he was held in the dry cell in painful black-box restraints and the emotional pain and suffering he has experienced since his release from the SHU. The Court calculates Mr. Censke's compensatory damages for physical and emotional pain and suffering based on the time he spent in black-box restraints within the segregated dry cell; as well as the post-traumatic emotional and physical pain

22

he has suffered as the result of this event; and awards him **$50,000.00 in compensatory damages** for this battery.

### III. <u>CONCLUSION</u>

The Court finds by a preponderance of the evidence that Officer Penman and other BOP officers battered Mr. Censke between December 16, 2013 and December 18, 2013, and that the United States is liable for these batteries under the FTCA. For Battery Claim I, Mr. Censke is awarded $1,500.00 in compensatory damages; for Battery Claim II, Mr. Censke is awarded $5,000.00 in compensatory damages; and for Battery Claim III, Mr. Censke is awarded $50,000.00 in compensatory damages. Accordingly, the Court awards a total of **$56,500.00 in compensatory damages** against the United States in Mr. Censke's favor.

Judgment consistent with the Order Granting Partial Summary judgment for the United States, (Dkt. 118), the Order Granting Partial Summary Judgment for Mr. Censke, (Dkt. 120), and this Order shall now issue under separate Order.

**SO ORDERED**.

Date: 3/28/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Thomas Andrew Censke
P.O. Box 446
Negaunee, Michigan  49866

J. Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE
tkirklin@usa.doj.gov

Justin R. Olson
UNITED STATES ATTORNEY'S OFFICE
justin.olson2@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Harmony A. Mappes
FAEGRE DRINKER BIDDLE & REATH LLP
harmony.mappes@faegredrinker.com

Emanuel McMiller
FAEGRE DRINKER BIDDLE & REATH LLP
manny.mcmiller@faegredrinker.com

Jason Rauch
FAEGRE DRINKER BIDDLE & REATH LLP
jason.rauch@faegredrinker.com

Elizabeth Anne Charles
FAEGRE DRINKER BIDDLE & REATH LLP
elizabeth.charles@faegredrinker.com